J-E04003-24          2025 PA Super 81

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                       :             PENNSYLVANIA
                       :
          v.             :
                       :
                       :
ISAIAH HEREFORD           :
                       :
         Appellant     :     No. 1162 WDA 2022

Appeal from the PCRA Order Entered September 8, 2022
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0010538-2010

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., STABILE, J., DUBOW, J.,
          KUNSELMAN, J., MURRAY, J., McLAUGHLIN, J., SULLIVAN, J., and
          BECK, J.

OPINION BY McLAUGHLIN, J.:               **FILED: April 8, 2025**

Isaiah Hereford appeals from the order denying his petition filed pursuant to the Post Conviction Relief Act ("PCRA"). **See** 42 Pa.C.S.A. §§ 9541-9546. We affirm.

This Court previously summarized the facts in this case as follows:

> [O]n the evening of June 14, 2010, Brittany Poindexter ["Brittany"] went to her brother's apartment in the Crawford Village housing complex in the McKeesport area for what turned out to be a surprise 18th birthday party. The party went on for several hours, with both family and friends present, and eventually guests began to leave. By the early morning hours of June 15, 2010, only five (5) people were left: Brittany, her brother Jahard, Jahard's boyfriend/roommate Marcus Madden, Brittany's boyfriend Tre Madden[,] and their friend, Angela Sanders. Shortly after 1:00 a.m., someone knocked on the screen door of the apartment; it was generally presumed that the person was there to buy a cigarette, since Jahard and Marcus sold cigarettes and marijuana out of the apartment. Marcus got

up to open the door and when he did, two (2) men entered holding guns. The men told everyone to "get down" and asked[,] "[W]here's the money?" When Jahard got up to get the money, the men started shooting. Jahard Poindexter, Tre Madden[,] and Angela Sanders were killed in the gunfire[,] and Marcus Madden was shot and injured. At trial, Marcus Madden identified [Hereford] as the first man who entered the apartment with a gun and one of the shooters. [DeAnthony Kirk admitted to being the other shooter.]

*Commonwealth v. Hereford*, No. 146 WDA 2018, 2019 WL 1093384, unpublished mem. at *1 (Pa.Super. filed March 8, 2019) (citation omitted).

In August 2011, a jury convicted Hereford of three counts of second-degree murder, two counts of aggravated assault, and one count each of robbery, burglary, and conspiracy to commit robbery. In December 2014, the court sentenced Hereford to three consecutive terms of imprisonment of 15 years to life.[1]

Hereford filed a direct appeal to this Court. Hereford argued that he was entitled to a new trial based on after-discovered evidence in the form of a 2012 statement by an alleged witness, Gina Simmons. Hereford asserted that Simmons would testify that after she heard gunshots on the night in question, she looked out of her window and saw two men running from the area of the crime and Hereford was not one of the two men. *Commonwealth v.*

---

[1] Hereford was initially sentenced to mandatory life imprisonment with no opportunity for parole. However, Hereford was 17 years old at the time of the murders. Following the United States Supreme Court decision in *Miller v. Alabama*, 567 U.S. 460, 465 (2012) (holding that mandatory life sentences without the possibility of parole were illegal for those offenders who commit their crimes prior to the age of 18), the trial court resentenced Hereford to three consecutive terms of imprisonment of fifteen years to life. *Hereford*, No. 146 WDA 2018, 2019 WL 1093384, unpublished mem. at *1 n.2.

*Hereford*, No. 232 WDA 2015, 2016 WL 1756981, unpublished mem. at *2 (Pa.Super. filed May 3, 2016). Hereford claimed that Simmons would also testify that she saw Hereford on his girlfriend's porch approximately 15 minutes after the incident. *Id.* This Court concluded that the trial court had properly denied Hereford's motion for a new trial because Hereford had failed to meet the four-prong test, *see infra*, for obtaining a new trial based on after-discovered evidence. *Id.* at *9. The Pennsylvania Supreme Court denied allowance of appeal.

Hereford then filed a timely PCRA petition in September 2017, which the PCRA court denied. He appealed to this Court, and we affirmed. *See Hereford*, No. 146 WDA 2018, 2019 WL 1093384, unpublished mem. at *1. We rejected his contention that his trial counsel was ineffective for failing to locate Simmons previously or present her testimony at his trial because Hereford had not shown that she was willing to testify on his behalf at his trial. *Id.* at *4. We explained that "[a]lthough she was aware [Hereford] had been arrested, charged, and convicted of murder, Simmons refused to come forward until long after [Hereford's] trial[.]" *Id.*

Hereford filed the instant PCRA petition on June 30, 2020, requesting a new trial based on a claim of newly discovered evidence. Hereford asserted that a previously unknown eyewitness, Quentin Ingram, had come forward in February 2020 and would testify that Hereford was not involved in the shootings. Hereford attached to his petition a certified witness statement that Ingram had signed.

At an evidentiary hearing on Hereford's petition, on February 17, 2022, Ingram and private investigator Keri Bozich testified. Ingram said that on the night of the murders, he was staying at his girlfriend's apartment at Crawford Village in Unit 29D. N.T. PCRA Hearing, 2/17/22, at 9-10. He went outside of his girlfriend's apartment onto the porch and saw two individuals outside of Unit 24B, the victims' apartment. *Id.* at 17-19. Ingram stated that one individual was adjusting a gun on his hip. *Id.* at 17. He also observed an individual "messing with a cell phone." *Id.* at 19. He stated that he followed them "just [to] see[] what was going on[.]" *Id.* at 36.

Ingram testified that he observed the two individuals look into the window of the victims' apartment, and then saw them "bum rush" the door of the apartment, at which point he heard them immediately start shooting. *Id.* at 19-20. Ingram stated that both men were taller than his height of 5'5". *Id.* at 23-24. He also said that both men weighed more than he did; were taller than Hereford's height, as observed in the courtroom; and had darker skin tones. *Id.* He stated that both men wore dark clothing and had shirts covering parts of their faces that they used as masks. *Id.* at 23, 25. Ingram testified that he could not see the men's full faces "because they had shirts covering certain sections of their face[s]." *Id.* at 80. He stated that one man had "[o]ne shirt tied at the top of his head and [another shirt] at the bottom of his face." *Id.* at 23. Ingram said that the other man had a thermal shirt "tied around his face where you put your head in." *Id.*

Ingram testified that Hereford was not one of the shooters he saw that night. *Id.* at 9, 79. He said he was familiar with Hereford because he had "seen him around the area and he also had a girlfriend who stayed in one of the houses that [his] mother owns." *Id.* at 41. Ingram testified that he is not related to Hereford or close friends with him. *Id.* at 41-42. He stated that no one intimidated him into testifying and he was not receiving any leniency on his own sentence.[2] *Id.* at 42-43.

Ingram explained that he did not tell anyone what he observed that night because he was a "known trespasser in Crawford Village" and was not permitted to be living there in his girlfriend's apartment. *Id.* at 37. He also stated that he did not say anything to anyone because he was a "known drug dealer." *Id.* Ingram testified that he always knew that Hereford was charged as an accomplice or co-conspirator in the murders, but he did not know that Hereford was convicted as the shooter until early 2020 when a fellow inmate informed him. *Id.* at 43, 47-49, 61. Ingram said that once he learned that Hereford was convicted as one of the shooters, he came forward and contacted Hereford's counsel in February or March 2020 because he had "seen the shooter so I know he wasn't the shooter." *Id.* at 30-31, 49, 78.

Ingram testified that after he made his statement that Hereford was not one of the shooters, a police detective, Detective Kinavey, came to his prison

---

[2] At the time of the hearing, Ingram was serving a sentence of 76 to 152 years' incarceration for criminal homicide and aggravated assault. N.T. PCRA Hearing at 50-51.

to interview him. *Id.* at 49-50. Ingram stated that he had no prior notice that Detective Kinavey was coming to see him. *Id.* at 54. He initially did not recognize Detective Kinavey, but Detective Kinavey reminded Ingram that he was the detective on Ingram's own case years before. *Id.* at 50, 56-58. Ingram testified that Detective Kinavey showed him his certified witness statement in this case. *Id.* at 57. Ingram stated that he declined to be interviewed by Detective Kinavey because he felt uncomfortable and intimidated by Detective Kinavey's questioning. *Id.* at 58. He explained that because the visit was unannounced, he was confused as to what was occurring and was worried about his safety because if he spoke to Detective Kinavey, the other inmates in the room would think that he was giving information to the police. *Id.* at 55, 57-58. Ingram testified that after Detective Kinavey left the prison, Ingram spoke with Hereford's PCRA counsel by phone and indicated that he was willing to talk to the detective about his statement now that he understood what was going on. *Id.* at 59. Ingram stated that Detective Kinavey did not come back to interview him. *Id.*

Ingram further testified that Gina Simmons – the witness who came forward in 2012 alleging that she witnessed two men running after the shooting and Hereford was not one of the shooters – is his mother. *Id.* at 62. He stated that on the night of the shooting, he stayed at his mother's house, which was a five-minute walk from his girlfriend's apartment. *Id.* at 40-41. Ingram testified that although he was aware that his mother had been involved in Hereford's case as an after-discovered witness, he "never

discussed" with her that Hereford was charged with murder and never told her that he, too, had witnessed the incident. *Id.* at 62-64. When asked by the Commonwealth whether he spoke to his mother about Hereford's role in the murders before he came forward in 2020, Ingram replied, "No, me and my mother talked very little of [Hereford]." *Id.* at 78.

After the hearing, both parties filed briefs. The PCRA court found that Hereford's petition satisfied the newly discovered facts exception to the PCRA's time-bar. However, it denied Hereford's PCRA petition on its merits. Hereford timely filed a notice of appeal. On February 9, 2024, a three-judge panel of this Court reversed and remanded for a new trial, and the Commonwealth timely moved for reargument. This Court granted *en banc* review, on April 12, 2024, and withdrew the panel's decision. Hereford filed a supplemental brief, and the Commonwealth filed a substituted brief.

Hereford raises the following issue: "The credible evidence offered at the evidentiary hearing showed that Isaiah Hereford is entitled to PCRA relief on his after-discovered evidence claim. The PCRA court nevertheless denied relief. Did the court err?" Hereford's Br. at 3.

On appeal from the denial or grant of relief under the PCRA, our review is limited to determining "whether the PCRA court's ruling is supported by the record and free of legal error." **Commonwealth v. Presley**, 193 A.3d 436, 442 (Pa.Super. 2018) (citation omitted).

Before addressing Hereford's issue on the merits, we address the Commonwealth's argument that the PCRA petition was untimely and Hereford

did not satisfy the new facts exception. *See* Com.'s Substituted Br. at 29-30. Any petition for PCRA relief, including a second or subsequent petition, must be filed within one year of the date on which the judgment of sentence becomes final, unless the petitioner pleads and proves an exception to the one-year bar. 42 Pa.C.S.A. § 9545(b)(1). For purposes of the PCRA, "a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." *Id.* at § 9545(b)(3).

Courts may consider a PCRA petition filed after the one-year deadline only if the petitioner pleads and proves at least one of the three statutory exceptions:

> (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

> (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

> (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

*Id.* at § 9545(b)(1)(i)-(iii). Any petition attempting to invoke an exception "shall be filed within one year of the date the claim could have been presented." *Id.* at § 9545(b)(2).

Here, Hereford's PCRA petition was facially untimely. Hereford has sought to invoke the newly discovered facts exception to the PCRA time-bar. To succeed in raising that exception, a petitioner must establish that: (1) "the facts upon which the claim is predicated were unknown," and (2) the facts "could not have been ascertained by the exercise of due diligence[.]" *Id.* at § 9545(b)(1)(ii). "[T]he due diligence inquiry is fact-sensitive and dependent upon the circumstances presented." *Commonwealth v. Shiloh*, 170 A.3d 553, 558 (Pa.Super. 2017) (citation omitted). Due diligence "does not require perfect vigilance nor punctilious care, but rather it requires reasonable efforts by a petitioner, based on the particular circumstances to uncover facts that may support a claim for collateral relief." *Commonwealth v. Brensinger*, 218 A.3d 440, 449 (Pa.Super. 2019) (*en banc*) (citation and internal quotation marks omitted).

The PCRA court concluded that Hereford sufficiently invoked the newly discovered facts exception to the PCRA time-bar. *See* PCRA Court Opinion, filed 12/15/22, at 6. The court did not err. The testimony at the PCRA hearing established that Ingram contacted Hereford's counsel in February or March 2020 to inform him that Hereford was not one of the shooters. Ingram testified that he did not tell anyone what he saw on the night of the murders until he contacted Hereford's counsel because he was a known trespasser and drug

dealer in Crawford Village. It was only when he learned in early 2020 that Hereford was convicted as one of the shooters that he contacted Hereford's counsel. The PCRA court evidently credited this much of Ingram's testimony. Since Hereford's June 30, 2020 PCRA petition was filed within one year of when he learned of this claim, he satisfied the newly discovered facts exception to the PCRA time-bar.

Once a petitioner establishes the PCRA court's jurisdiction, the petitioner may then present a substantive after-discovered evidence claim under 42 Pa.C.S.A. § 9543(a)(2)(vi). *Commonwealth v. Reeves*, 296 A.3d 1228, 1232 (Pa.Super. 2023). That subsection provides relief when a petitioner pleads and proves by a preponderance of evidence that the conviction resulted from "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S.A. § 9543(a)(2)(vi). The after-discovered evidence must meet a four-prong test:

> (1) the evidence could not have been obtained before the conclusion of the trial by reasonable diligence; (2) the evidence is not merely corroborative or cumulative; (3) the evidence will not be used solely for purposes of impeachment; and (4) the evidence is of such a nature and character that a different outcome is likely.

*Commonwealth v. Rivera*, 939 A.2d 355, 359 (Pa.Super. 2007).

Hereford argues that Ingram's testimony at the PCRA hearing was credible, and that he satisfied the four-prong test for an after-discovered evidence claim. Hereford's Br. at 42, 52. Hereford maintains that the first

- 10 -

prong is satisfied because Ingram's testimony could not have been obtained before the conclusion of the trial as no one knew that Ingram saw the shooters or was even present in Crawford Village on the night of the murders until 2020. *Id.* at 52.

Hereford further argues that he satisfied the second and third prongs because the after-discovered evidence is not merely corroborative or cumulative and would not be used solely for purposes of impeachment. *Id.* He points out that only two eyewitnesses testified at trial, Brittany Poindexter and Marcus Madden. *Id.* He emphasizes that Brittany could not identify the two masked gunmen and Madden, who identified Hereford as one of the shooters, "had been drinking and smoking marijuana before the shooting, . . . was traumatized after being shot in the head during the vicious attack, . . . initially said he 'didn't see anything,' and [his] testimony materially conflicted with [Brittany's.]" *Id.* at 52-53. He argues that the "new evidence is of a different grade and character than the means used to challenge the sole identification eyewitness's testimony at trial" and is "significant because it consists of a new eyewitness account from a person who saw the shooters immediately before they entered Apartment 24B and started shooting." *Id.* at 53. Hereford points out that Ingram's testimony was corroborated by Brittany's trial testimony, in that they testified that both shooters had shirts covering their faces, whereas Madden claimed one of the gunmen was unmasked. *Id.* at 48-49. He further argues that Ingram's testimony that the shooters were taller than Hereford is consistent with Brittany's statement that

- 11 -

both shooters were approximately 5'10". *Id.* at 49. Hereford also notes that the photos and video taken by his investigator and introduced into evidence at the PCRA hearing corroborated Ingram's testimony, as they showed that, from Ingram's vantage point, he was able observe the shooters and gauge their height and whether they were wearing a mask. *Id.* at 45-47.

Hereford lastly argues that the new evidence would result in a different verdict, thus satisfying the fourth prong. *Id.* at 54. Hereford asserts that Ingram had no allegiance to Hereford or the victims, had no motive to lie, and his testimony affirmatively excluded Hereford as one of the shooters. *Id.* at 53-55.

"[W]e must defer to the PCRA court's findings of fact and credibility determinations [if they are] supported by the record." ***Commonwealth v. Spotz***, 84 A.3d 294, 319 (Pa. 2014). This is because "[t]he PCRA court, and not the appellate courts, has personally observed the demeanor of the witnesses[.]" *Id.* "The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions." ***Commonwealth v. Mason***, 130 A.3d 601, 617 (Pa. 2015) (citation omitted).

Here, the PCRA court found Ingram's testimony was not credible and was unlikely to result in a different verdict if a new trial were granted. ***See*** PCRA Ct. Op. at 6-7. The court explained:

> After the evidentiary hearing, the PCRA court found [Ingram] was not credible. The hearing amounted to a slide show of photographs where the witness identified numerous

residences in a housing community where the murders occurred. He did not observe the shooting. He admitted that the alleged shooters faces were covered. He opined that [Hereford] was not the same height as the person who forced his way into the victim[s'] residence the night of the murder[s]. The witness did not give a statement to police on the night of the shooting, supposedly because he was a trespasser in the public housing community, and a reputed drug dealer. The witness, who is currently serving a life sentence for murder, finally came forward more than 10 years after allegedly making his observations. When the defense presented the alleged after discovered evidence, Allegheny County Homicide Detective Kinavey attempted to interview the witness who refused claiming he didn't know the detective. This is puzzling since Detective Kinavey is the same police officer who investigated and prosecuted the witness in his own homicide trial.

Under the circumstances, the court did not find [Ingram] to be credible. Additionally, the court does not believe that the outcome of the trial would differ even with the proposed after discovered evidence. This claim is without merit.

***Id.***

The PCRA court, after carefully reviewing Ingram's testimony, made specific credibility determinations. We must defer to the PCRA court's credibility determinations if they are supported by the record. ***See Spotz***, 84 A.3d at 319.

The record here indicates that Ingram followed two masked individuals, one of whom had a visible gun, "just [to] see[] what was going on." N.T. PCRA Hearing at 36. Ingram conceded that he did not see the actual shooting and could not see the individuals' full faces because they were wearing shirts covering parts of their faces. ***Id.*** at 47, 80. Ingram also stated that the two men "bum rushed" the victims' apartment. ***Id.*** at 38. By "bum rush" he meant,

"[l]ike hurry up, run to the door, like push the door, they was running in there and that's when you just hear shooting." *Id.* However, this testimony was contradicted by Madden's and Brittany's trial testimony.

Madden testified that on the night of the murders, he heard a knock at the door and went to open it. N.T. Trial, 8/1/11-8/4/11, at 373-74. When he opened the door, the screen door was still locked, and he saw Hereford standing there asking him for a cigarette. *Id.* at 374-75. Madden stated that he had no trouble seeing Hereford's face "[b]ecause he was standing right in front of [him]" and there were lights on outside. *Id.* Madden said he turned to Jahard Poindexter and asked him if they had any cigarettes. *Id.* at 376. Jahard said that they did and handed a cigarette over to Madden. *Id.* Madden unlocked the door to give Hereford the cigarette and Hereford then entered the apartment with a gun drawn, screaming, "Get down, where is the money[?]" *Id.* at 376-77. Madden then started backing up into the apartment towards his TV and ended up by his computer. *Id.* at 377. Madden testified that a second gunman then entered the apartment, but he could not see his face because it was covered by a shirt. *Id.* at 377-78. Madden stated that the screaming got louder, Jahard was pushed against the wall, and then the shooting started. *Id.* at 378-79.

Brittany similarly testified that on the night of the murders, there was a knock at the door and Madden answered it. *Id.* at 63. After answering the door, Madden stated that someone wanted to buy a cigarette. *Id.* Brittany testified that her brother, Jahard, got up and handed a cigarette to Madden.

- 14 -

*Id.* at 63-64. She stated that Madden brought the cigarette over to the door. *Id.* at 64. She next saw Madden backing up with his hands up and an individual entering the apartment with a gun drawn. *Id.* at 64-65. Brittany did not know whether the first gunman had a mask on because she "was looking at the gun."[3] *Id.* at 66. She said that the first gunman kept screaming, "[E]verybody get down, where's the cash[?]" *Id.* Brittany testified that a second man then entered the apartment with a gun drawn and had two black shirts tied around his face. *Id.* at 66-67. She said the second gunman was also screaming, "[W]here's the cash[?]" *Id.* at 67. Brittany testified that at that point, her brother got up to give them the money, and "they immediately started shooting." *Id.* 68-69. Ingram's account that the shooters simultaneously entered the apartment and immediately started shooting is thus inconsistent with Madden's and Brittany's testimony that there was an exchange about purchasing a cigarette before the shooting and that the shooters entered one-by-one.

Further, Ingram's reasons for not informing the police of what he saw that evening – that he was a known trespasser and drug dealer at that time – do not adequately explain why he waited 10 years to come forward. Moreover, as the PCRA court noted, Ingram had nothing to lose by testifying in this case

---

[3] Detective Dereck Stitt testified at trial that he spoke to Brittany on the night of the murders at the hospital. N.T. Trial at 99. He testified Brittany was upset and appeared to be in shock, and she could not give a description of the shooters. *Id.* at 99-100. However, he said that she told him that one of the shooters had something covering his face and the other one had a t-shirt covering his chin. *Id.* at 101.

as he is serving what is essentially a life sentence for murder. Additionally, Ingram's claim that although he was aware that his mother was involved in Hereford's case as an after-discovered witness, but never discussed Hereford's role in the crime with his her, is suspect on its face. Simmons made a witness statement in 2012 and testified at Hereford's PCRA hearing in 2018. The notion that Simmons and Ingram – mother and son – both witnessed the crime from different vantage points, made claims favorable to Hereford that he was not one of the shooters, and never discussed the matter with each other is implausible.

Since there is support in the record for the PCRA court's credibility determination, it is binding on this Court. **Mason**, 130 A.3d at 617. Respectfully, the dissent reaches the opposite conclusion by reweighing the evidence, instead of looking to see if the record supports the trial court's credibility determination. The PCRA court's ruling that Ingram's testimony, which the court found lacking in credibility, was unlikely to result in a different verdict at a new trial was free of legal error. We thus affirm the order denying PCRA relief.

Order affirmed.

President Judge Emeritus Panella, Judge Stabile, Judge Dubow, Judge Murray, Judge Sullivan and Judge Beck join the Opinion.

President Judge Lazarus files a Dissenting Opinion in which Judge Kunselman joins.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 04/8/2025