J-E04003-24          2025 PA Super 81

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ISAIAH HEREFORD | : | |
| | : | |
| Appellant | : | No. 1162 WDA 2022 |

Appeal from the PCRA Order Entered September 8, 2022
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0010538-2010

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., STABILE, J., DUBOW, J.,
KUNSELMAN, J., MURRAY, J., McLAUGHLIN, J., SULLIVAN, J., and
BECK, J.

DISSENTING OPINION BY LAZARUS, P.J.:          **FILED: April 8, 2025**

I respectfully dissent from the learned Majority's conclusion that the PCRA court's factual findings are supported by the record and affirming the order dismissing Hereford's PCRA petition.  In my view, the PCRA court's factual findings are not supported by the record in this case and, accordingly, I would reverse and remand for a new trial.

The Majority accurately represented the relevant procedural history and correctly concluded that Hereford has satisfied the newly discovered fact exception to the PCRA time bar.  **See** Majority Opinion, at 2-3, 8.  However, I disagree with the Majority's conclusion that the PCRA court's findings are supported by the record.  As such, the following is a brief recitation of the relevant testimony.

On June 14, 2010, Brittany Poindexter attended the birthday party of her brother, Jahard, at Jahard's apartment in McKeesport's Crawford Village.[1] As the evening wore on, only five people remained at the party: Brittany, Jahard, Angela Sanders, Tre Madden, and Marcus Madden. Shortly after 1:00 a.m. on June 15, 2010, someone knocked on the screen door of the apartment's front door. It was generally presumed that the person was there to buy a cigarette or marijuana, since Jahard and Marcus sold cigarettes and marijuana out of the apartment. When Marcus approached the door, two armed men burst into the apartment. The two gunmen demanded money from the five people inside. Jahard attempted to retrieve the money but the gunmen opened fire on all five occupants. Jahard, Tre, and Angela died as a result. Brittany was uninjured and survived. Marcus was shot in the head but ultimately survived the shooting. Both Brittany and Marcus testified at the subsequent jury trial.

At trial, Brittany testified that she saw both gunmen but was unable to identify either. *See* N.T. Jury Trial (Day 1), 8/1/11, at 76. Brittany testified that the first gunman was holding a black handgun. *Id.* at 65. Brittany stated she knew the difference between a semi-automatic handgun and a revolver. *Id.* Brittany further stated that the handgun was a Smith & Wesson revolver, and she remembered that fact "[b]ecause the gun was in [her] face." *Id.* at 65-66; *see also id.* at 78 (Brittany testifying she was certain first gunman

---

[1] Crawford Village is a Section 8 public housing community located in McKeesport, Pittsburgh. Jahard lived in apartment 24B.

held revolver). Brittany testified that the second gunman was holding a black semi-automatic handgun. *Id.* at 67. Brittany stated that the second gunman yelled "Where's the cash[?]" *Id.* at 67, 79-81. Brittany further testified that the second gunman was wearing "two black shirts tied around his face." *Id.*

Marcus also testified that he knew the difference between a semi-automatic and a revolver. *See* N.T. Jury Trial (Day 3), 8/3/11, at 396. However, in contrast to Brittany's testimony, Marcus testified that the first gunman had a semi-automatic handgun, and the second gunman held a revolver. *Id.* at 396-98. Marcus specified that the second gunman's weapon had a longer barrel and a cylinder. *Id.* Additionally, Marcus testified that the second gunman never spoke. *Id.* at 392.

Marcus testified that Hereford was the first gunman, and that Hereford did not have his face covered. *Id.* at 375, 398-99. He stated that the first gunman, who he had identified as Hereford and estimated was 5'10" in height, was taller than the second gunman, DeAnthony Kirk, Hereford's co-defendant. *Id.* at 389, 392, 398. Marcus was confident in his assessment, because Marcus, himself, is 5'10" and Marcus and the first gunman were standing "eye-to-eye" when Marcus first answered the door and saw the gunman. *Id.* However, at trial, Hereford and Kirk stood side-by-side and Marcus testified that Kirk was noticeably taller than Hereford.[2] *Id.* at 398-99. Additionally,

_____

[2] Counsel failed to introduce Hereford's height at this time. However, I note that Hereford is either 5'5" or 5'6". *See* Affidavit of Probable Cause, 6/17/10,
*(Footnote Continued Next Page)*

Marcus testified that, prior to the shootings, he had been imbibing alcohol and was under the influence of marijuana. *Id.* at 370-71, 404.

At the instant PCRA hearing, Hereford presented the testimony of Quentin Ingram. Ingram testified that he was visiting his girlfriend in Crawford Village on the night of the above-described murders. *See* N.T. PCRA Hearing, 2/17/22, at 8-10. Ingram testified that his girlfriend lived in apartment 29D. *Id.* at 9-10; *see also id.* at 12-13, Defense Exhibits A-1, A-2 (photographs depicting Ingram's girlfriend's apartment). Ingram stated that he is very familiar with Crawford Village and its layout because he grew up there and lived there his entire life. *Id.* at 10-11 (Ingram testifying his mother lived across street from Crawford Village and Ingram has three siblings still living in McKeesport neighborhood). Ingram explained that Crawford Village is a series of rows of buildings designated by numbers, and each apartment in a row is designated by a letter "A" through "H." *Id.* at 12-17 (Ingram identifying each row of homes and explaining Crawford Village's general layout); *id.* at 15-16, 21 (Ingram shown present day photographs depicting Crawford Village and testifying housing complex has identical layout as it did in 2010).

_____

at 1 (listing Hereford's height as 5'5"); Warrant of Arrest, 6/17/10, at 2 (listing Hereford's height as 5'5"); *see also* PCRA Petition, 6/30/20, at 21 (listing Hereford's height as 5'6"). Moreover, I observe that the Pennsylvania Department of Corrections' Inmate Locator Tool confirms that Hereford is 5'6." *See* https://inmatelocator.cor.pa.gov, last updated 1/5/24 (last visited 1/5/24).

Ingram testified that, late on the evening of June 14, 2010, into the early morning hours of June 15, 2010, he was on the porch of his girlfriend's apartment, "29D." *Id.* at 16-17. From his vantage point, Ingram saw two men near apartment 29A, one of whom was adjusting a firearm on his hip. *Id.* at 17, 21-23. Ingram testified that the two men were taller than him, wearing dark clothing, had shirts tied around their faces, and were darker-skinned than Ingram. *Id.* at 23. One of the men had two black shirts tied around his face, and the other man had only one shirt tied around his face. *Id.* Ingram testified that he is 5'5" and weighs 150 pounds, but at this distance he could easily tell both men weighed more than him and were taller than him. *Id.* at 23-24. Ingram clarified that the two men were closer to PCRA counsel's height, which was noted for the record as 5'11." *Id.* at 24. Ingram further testified that both men were taller than Hereford's height of 5'6." *Id.*

Ingram left the porch, followed the men, and again saw the two men while Ingram was on the staircase between buildings "28" and "29." *Id.* at 16, 18-19, 36; *id.* at 16-18, Defense Exhibit A-4 (depicting staircase between buildings 28 and 29). From this vantage point, Ingram saw the two men standing outside of 24B, Jahard's apartment. *Id.* at 18-19. Ingram testified that one of the men appeared to be "messing with a cell phone" and the other man "looked in the window of 24B." *Id.* at 19-20. Ingram stated he saw both men "bum rush" the door of apartment 24B. *Id.* at 19. Ingram said that almost immediately after the men entered 24B, he heard multiple gunshots

from two different firearms. *Id.* at 37-38. Ingram testified that he ran back into his girlfriend's apartment as soon as he heard the gunshots. *Id.* at 38-39. Ingram testified that he saw police arrive shortly thereafter but did not speak with them. *Id.* at 39-40. After police cleared the scene, Ingram left his girlfriend's apartment and walked to his mother's home, which was approximately five minutes away. *Id.* at 40-41.

Ingram testified that neither of the men he saw that night were Hereford. *Id.* at 8-9, 41-42. Ingram stated that he knew Hereford but was not close friends with him because Hereford was younger and "hung out with younger people." *Id.* at 41-42; *id.* at 65-67 (Ingram clarifying on cross-examination that he knew Hereford from the community and Hereford's girlfriend lived in a house Ingram's mother previously owned). Ingram testified that he could not identify either of the two men; however, he was certain neither man was Hereford due to the height and weight discrepancies, as well as both shooters having darker skin tones than Hereford. *Id.* at 42, 47-49; *id.* at 79 (Ingram testifying on re-direct examination that it did not make sense for Hereford to be one of the shooters, because Ingram did not see Hereford there and the shooters had dark skin tones).

Although the Majority has accurately set forth our standard of review, I emphasize that the PCRA court's factual findings are only binding on this court when those findings are supported by the record. *See Commonwealth v. Mason*, 130 A.3d 601, 617 (Pa. 2015) ("We view the findings of the PCRA court and the evidence of record in the light most favorable to the prevailing

party. . . . The PCRA court's credibility determinations, **when supported by the record**, are binding on this Court.") (emphasis added, citations omitted).

Preliminarily, I observe that the PCRA court, in its opinion, found Ingram to be not credible, and addressed Hereford's claim as follows:

> [Hereford] alleges the PCRA court erred by denying relief based on after[-]discovered evidence. After the evidentiary hearing, the PCRA court found [Ingram] was not credible. The hearing amounted to a slide show of photographs where [Ingram] identified numerous residences in a housing community where the murders occurred. He did not observe the shooting. He admitted that the alleged shooters['] faces were covered. He opined that [Hereford] was not the same height as the person who forced his way into the victim's residence the night of the murder. [Ingram] did not give a statement to police on the night of the shooting, supposedly because he was a trespasser in the public housing community, and a reputed drug dealer. [Ingram,] who is currently serving a life sentence for murder, finally came forward more than 10 years after allegedly making his observations. When the defense presented the alleged after[-]discovered evidence, Allegheny County Homicide Detective Patrick Kinavey attempted to interview [Ingram,] who refused[,] claiming he didn't know the detective. This is puzzling since Detective Kinavey is the same police officer who investigated and prosecuted [Ingram] in his own homicide trial.
>
> Under these circumstances[,] the court did not find [Ingram] to be credible. Additionally, the court does not believe that the outcome of the trial would differ even with the proposed after[-]discovered evidence. This claim is without merit.

PCRA Court Opinion, 12/15/22, at 6-7.

Based upon my review of the record, I would conclude that the PCRA's finding that Ingram is not credible is unsupported by the record. In so concluding, I am cognizant that our standard of review is very deferential to the PCRA court's credibility assessments. **See Mason**, **supra**. However, the

PCRA court's credibility assessments are not absolute, and are still subject to review on appeal. **See id.** Importantly, the PCRA court's credibility determination **must be supported by the record**. **See id.**

Indeed, PCRA courts are required to analyze after-discovered evidence claims under the four-prong test outlined in section 9543(a)(2)(vi). In order to succeed on an after-discovered evidence claim, a petitioner must demonstrate that the evidence:

> (1) could not have been obtained prior to the conclusion of the trial by the exercise of due diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

**Commonwealth v. Medina**, 92 A.3d 1210, 1218 (Pa. Super. 2014).

Here, the PCRA court did not identify the after-discovered evidence test, much less discuss any of the prongs, except for a conclusory determination that "the court does not believe that the outcome of the trial would differ." PCRA Court Opinion, 12/15/22, at 7. In reaching this conclusion, the PCRA court did not discuss any facts of the case, or relevant case law. **See id.** at 1-7. The PCRA court did not analyze the discrepancies between the testimony of Brittany and Marcus or address how Ingram's testimony impacts any portion of the case.[3] **See id.**

---

[3] I further observe that, while the PCRA court's opinion is seven pages in length, it only reaches this length because the PCRA court addressed six claims raised in Hereford's Rule 1925(b) concise statement. **See id.** at 3 (listing Hereford's Rule 1925(b) claims). However, the PCRA court "addresses" each
*(Footnote Continued Next Page)*

Moreover, some of the facts that the PCRA court employed to conclude that Ingram was not credible are facts that are **not supported** by the jury trial transcript. In particular, the PCRA court noted that Ingram "opined that [Hereford] was not the same height as the person who forced his way into the victim's residence the night of the murder." **See** PCRA Court Opinion, 12/15/22, at 6. However, Ingram's "opinion" is corroborated by Marcus' testimony, the arrest warrant, and the affidavit of probable cause. **See** N.T. Jury Trial (Day 3), 8/3/11, at 375, 389-90 398-99; **see also** Affidavit of Probable Cause, 6/17/10, at 1 (listing Hereford's height as 5'5"); Warrant of Arrest, 6/17/10, at 2 (listing Hereford's height as 5'5"). As I noted **supra**, Marcus testified that he identified the first gunman as Hereford, and that Hereford was not wearing a mask. **See id.** He also testified that the second gunman was taller than the first gunman and that the first gunman was 5'10," the same height as Marcus. **See id.** at 389. However, when Hereford stood back-to-back with Kirk at trial, Marcus testified that Hereford was significantly shorter than Kirk. **See id.** at 398-99. Accordingly, it is clear from the record that it is not Ingram's "opinion" that Hereford was not the same height as the first gunman, but rather a fact corroborated by other evidence.

Additionally, the PCRA court discounts Ingram's testimony because he did not witness the shooting. **See** PCRA Court Opinion, 12/15/22, at 6.

_____

of these claims in a paragraph or less. Thus, I respectfully disagree with the Majority's conclusion that the PCRA court "carefully review[ed] Ingram's testimony." Majority Opinion, at 12.

Nevertheless, Ingram observed the men for the period just prior to their entrance into Jahard's home. *See* N.T. PCRA Hearing, 2/17/22, at 16-24, 36-42. No other witness in this case testified about the perpetrators' actions prior to their entry into the residence. Moreover, as I outlined above, Ingram's testimony at the PCRA hearing is corroborated, in part, by the surviving eyewitnesses' testimony. Ingram saw two gunmen, both darker skinned with shirts covering their faces, one of whom covered his face utilizing two black shirts, one of whom appeared to be operating a cell phone prior to entering the home, and then, almost immediately after they entered the home, Ingram heard multiple gunshots. *See id.* at 18-20, 23, 37-39. This testimony is consistent with Brittany's trial testimony that she saw the two men rush into Jahard's home, brandish firearms, and open fire. *See* N.T. Jury Trial (Day 1), 8/1/11, at 76, 79-81. Notably, Brittany testified that one of gunmen's faces was covered by two black shirts wrapped around his head. *See id.*

The PCRA court also found Ingram not credible due to his failure to report to police on the night of the incident and his failure to speak with Detective Kinavey. *See* PCRA Court Opinion, 12/15/22, at 6. However, Ingram provided credible explanations for his unwillingness to speak with authorities. Ingram testified that he was a known drug dealer and a trespasser in Crawford Village and did not come forward because admitting his presence as a known drug dealer at his girlfriend's house, in Section 8

housing, would cause her to lose her home.[4]  ***See*** N.T. PCRA Hearing, 2/17/22, at 36-37, 41.

Regarding his refusal to speak with Detective Kinavey, Ingram testified that Detective Kinavey arrived at SCI Forest unannounced and attempted to interview him.  ***Id.*** at 55-56.  Ingram testified that he was afraid the other inmates would be able to see into the interview room and think that he was giving information to the police.  ***See id.***  Ingram agreed to be recorded by Detective Kinavey "to tell him that I wanted to testify to the truthfulness" of the certified statement provided to PCRA counsel but that Ingram did not want to talk due to the presence of other inmates.  ***See id.*** at 57-59.[5]  Ingram testified that, after Detective Kinavey left SCI Forest, Ingram spoke with Hereford's PCRA counsel and conveyed his desire to be interviewed by Detective Kinavey.  ***Id.*** at 59-60.  However, the Commonwealth made no second attempt to interview Ingram.  Based upon the foregoing, and the PCRA court's cursory analysis, I fail to see how the above testimony detracts from Ingram's credibility.  On the contrary, Ingram's testimony at the PCRA hearing reveals that he had a legitimate concern that other inmates may misinterpret

---

[4] I note that neither trespass nor drug offenses qualify as *crimen falsi*.

[5] Detective Kinavey recorded Ingram's statement at this time.  However, when PCRA counsel attempted to introduce the recording, the Commonwealth objected to its omission and the PCRA court sustained the objection.  ***See id.*** at 52-54.  Consequently, it is not a part of the certified record before this Court.  Moreover, I observe that Detective Kinavey was present as a potential rebuttal witness at the PCRA hearing, but the Commonwealth chose not to call him to testify.  ***See id.*** at 4-5; ***see id.*** at 90 (Commonwealth stating they were not calling witnesses).

the unannounced police visit. Moreover, Ingram indicated his willingness to conduct a second interview, which the Commonwealth did not pursue.

Therefore, I would conclude that the PCRA court's credibility determination is unsupported by the record. Accordingly, I would address whether Hereford has satisfied the four-prong after-discovered evidence test required to warrant a new trial. **See Medina**, **supra**.

Regarding the first prong of the after-discovered evidence test, the Majority concludes that Hereford could not have obtained Ingram's testimony with the exercise of due diligence for the purposes of satisfying the newly-discovered facts exception to the PCRA's time bar. **See** Majority Opinion, at 8. Specifically, Hereford could not have discovered Ingram's testimony because he was entirely unaware that Ingram had witnessed the two perpetrators entering the home. For the same reasons, I conclude that Hereford has satisfied the first prong of the after-discovered evidence test.

Similarly, I would conclude that Hereford has satisfied the second and third prongs of the test. Based upon my review, Ingram's testimony is corroborated **in part** by the testimony of both Brittany and Marcus. Additionally, Ingram's testimony calls into question **some parts** of Marcus's testimony. However, Ingram's testimony is not presented purely for the sake of impeachment, nor is it entirely cumulative. Rather, as detailed above, Ingram is the only known witness to have seen the two gunmen prior to their entry into Jahard's home. Additionally, Ingram had unimpeded vantage points of both gunmen, and he could ascertain their approximate height, weight, and

skin tone. *See* N.T. PCRA Hearing, 2/17/22, at 16-24, 36-42. No other witness presented this evidence.[6] Consequently, I would conclude that Hereford has satisfied the second and third prongs. *See Commonwealth v. Small*, 189 A.3d 961, 974 (Pa. 2018) ("If the new evidence is of a different and ['‌]higher['] grade and character, though upon the same point, or of the same grade or character on a different point, it is not ['‌]merely['] corroborative or cumulative, and may support the grant of a new trial based on after-discovered evidence.").

Regarding the final prong, whether Ingram's testimony is likely to result in a different verdict, "a court should consider the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, **and the overall strength of the evidence supporting the conviction**." *Commonwealth v. Padillas*, 997 A.2d 356, 365 (Pa. Super. 2010) (emphasis added). "[C]ases that have addressed [after-discovered evidence] have focused not simply on the credibility of the person offering the exculpatory evidence, but on the credibility or trustworthiness of the evidence itself, as well as the motive, or other impeaching characteristics, of those offering it." *Id.* (quotation and citation omitted).

As I concluded above, the PCRA court's credibility determination was not supported by the record, and I emphasize that the PCRA court **did not** analyze

---

[6] As noted above, Marcus' testimony as to Hereford's height being 5'10" was contradicted by his own subsequent testimony as well as by the affidavit of probable cause, Hereford's arrest warrant, and the PCRA hearing transcript.

the overall strength of the evidence supporting Hereford's convictions. Further, Ingram's testimony is supported by the record and offers new probative evidence regarding the identification of the gunmen. Additionally, I observe that at the PCRA hearing, Ingram testified that he was serving a 76-to-152-year sentence for homicide. *See* N.T. PCRA Hearing, 2/17/22, at 43, 50-51, 73-74. Ingram further testified that he was not testifying in the hopes of securing a more lenient sentence.[7] *See id.* at 43; *id.* at 49 ("[Coming forward] doesn't benefit me but—it doesn't. Some type of way it makes me feel better because I'm coming to tell the truth basically. You know, knowing I know what was happening. But that's something that can weigh on your conscience, you know, something like this happened, for the victim's family, for [Hereford]'s family it's—you know, it kind of makes me feel better coming forward saying what happened[.]"). Ingram testified that no one paid him, intimidated him, incentivized him, or otherwise induced him to testify. *See id.* at 42-43. Ingram stated that he came forward simply because he knew Hereford was not involved in the June 15, 2010 homicide. *See id.* at 43; *id.*

_____

[7] The Majority concludes that "Ingram had nothing to lose." Majority Opinion, at 15. While this may be true, Ingram also had nothing to gain. He was not promised and was not seeking a more lenient sentence. *See* N.T. PCRA Hearing, 2/17/22, at 49.

Additionally, the Majority concludes that "it is suspect on its face" that Ingram did not discuss Hereford's case with Simmons, his mother. Majority Opinion, at 15-16. However, there is nothing **in the record** to support a conclusion that Ingram had discussed Hereford's case with Simmons, and our standard of review is whether or not **the record supports the PCRA court's factual findings**. *See Mason*, *supra*.

at 49 ("That's what made me come forward was because now it's more clear like well, I seen the shooter so I know [Hereford] wasn't the shooter."). Ingram further testified that he had originally believed Hereford was investigated but not convicted of shooting the victims. *Id.* at 44-49.

Based upon my review of the record, the Commonwealth's theory that Hereford was one of the shooters largely relied upon Marcus's identification of Hereford. However, Marcus's testimony was internally inconsistent, was at odds with Brittany's testimony, and would be at odds with Ingram's testimony. Furthermore, there is no forensic evidence linking Hereford to the scene of the murders.[8] Therefore, in my view, it is likely that Ingram's testimony that Hereford was **not** one of the shooters, would result in a different verdict. *See Medina*, *supra*; *see also Padillas*, *supra*. In sum, I would conclude that the PCRA court's factual findings are unsupported by the record, and that

---

[8] At trial, the Commonwealth also presented evidence of cell phone calls. *See* N.T. Jury Trial (Day 3), 8/3/11, at 436-44. The evidence at trial reflects that 13 to 16 calls were made from a cell phone number registered to Kirk, to a cell phone number registered to Hereford, immediately prior to and after the murders. *See id.* These calls were introduced into evidence by Detective Lane Zabelsky, a lay witness. *See id.*; *see also* Commonwealth Exhibits 209, 211, 212 (cell phone records). There was no expert testimony regarding the phone calls, no testimony or evidence regarding the location of the cell phones at the times these calls were made, and no testimony or evidence of what words, if any, were spoken. *See* N.T. Jury Trial (Day 3), 8/3/11, at 436-44 (Detective Zabelsky testifying exclusively based upon cell phone records that only document phone call dates, times, and durations). Consequently, I merely note that this was the only other evidence presented by the Commonwealth tending to demonstrate Hereford's involvement. Nevertheless, I conclude that this evidence is irrelevant to whether Ingram's testimony is credible, constitutes appropriate after-discovered eyewitness evidence, or whether it would be likely to compel a different result.

Ingram's testimony is of probative value, is not merely cumulative or corroborative, and would likely result in a different verdict. Accordingly, I respectfully dissent from my learned colleagues and I would reverse the PCRA court's order denying Hereford's PCRA petition and remand for a new trial.

Kunselman, J., Joins this Dissenting Opinion.